IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JONATHAN BRUCE REED,       §
                           §
      Petitioner,          §
                           §
v.                           §            Civil Action No. 3:99-CV-0207-N
                           §
DOUGLAS DRETKE,         §
                           §
      Respondent.         §

## OPINION

This is a death penalty habeas case.  It is presently before the Court on the motion for summary judgment of Respondent Douglas Dretke, Director, Texas Department of Criminal Justice, Correctional Institutions Division (the "State"), and also following an evidentiary hearing on Reed's claim that the State knowingly sponsored perjured testimony.  As the Court discusses at greater length below, the State of Texas' decision to deny the state petition for habeas corpus was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the State's motion for summary judgment is granted in part, Reed's claims are denied in part following the evidentiary hearing, and Reed's petition is dismissed.

# I. BACKGROUND

## A. Factual Background

The Court's factual recitation is taken from the opinion of the Texas Court of Criminal

Appeals ("CCA") affirming Reed's conviction and sentence.

The victim, her sister [], and a friend [Roommate], shared a two-bedroom apartment at One Way Place in Dallas.   All were employed by Braniff International Airlines as flight attendants.

On the morning of Wednesday, November 1, 1978, [Roommate] was alone in the apartment.  The previous day she had been assigned to a flight bound for Hawaii and arranged to meet her father at a local restaurant the next morning to borrow $100 for the trip.  When she left her apartment at 11:40 a.m. she was already ten minutes late.  She arrived at the restaurant at about 11:50 and shared lunch with her father until he had to leave at 12:30 p.m.  After receiving five $20 bills from him and placing them inside her checkbook, she returned directly to her apartment.

Upon arriving she noticed the victim's suitcase near the front door and concluded that her roommate had returned sooner than expected from her last flight.  The victim's purse was on the living room sofa with many of its contents scattered about.  [Roommate] set her own purse down next to it. Almost immediately she heard a male voice from behind a closed bedroom door say, "Don't come in here.  Stay out there."  Assuming that the man was a friend of the victim's, she replied, "Don't worry, I won't come in."

[Roommate] stood in front of the television set for a moment, watching an afternoon soap opera.  Shortly the bedroom door opened and she heard a voice behind her say, "Hi."  Turning, she observed a man lean through the doorway with one hand on its molding and snapping closed a knife sheath with the other.  Before she could introduce herself, he said, "I'm with maintenance; I came to check and change the air conditioner filters," and pointed toward the bedroom ceiling.

[Roommate] stuck her head through the doorway but could see no ductwork in the vicinity.  Then, lowering her gaze, she noticed the nude body of the victim protruding spread-eagle from beneath the bed.  As she turned toward the man he grabbed her by the throat with both hands and threw her to the

living room floor on her stomach, saying, "Don't move or I'll break your fucking neck."

Soon she heard him rummaging through the bedroom and then the sound of cloth tearing. In a moment he returned, gagged her with a Braniff uniform sash, tied her hands with a leather belt, and covered her head with an apron. She then heard him sit down in the bedroom and ask, "Do you have any money?" Thinking he was talking to the victim, she made no reply, but when asked again she shook her head to indicate "No." Then, remembering a $20 bill in her wallet, she nodded her head affirmatively.

The man next proceeded to the sofa and began searching through the contents of both purses. He made several circuits of the apartment during which he drank water from a glass in the kitchen and looked through the bedroom and living room areas. After a time he returned to [Roommate]. Straddling her with his legs, he placed both hands at her throat and began strangling her. When the pain became almost more than she could bear, [Roommate] feigned unconsciousness. The man then released and briefly reapplied pressure. Removing the apron from her face, he threw it to the floor, circled the apartment once again and left.

[Roommate] jumped to her feet, pulled free of her bindings, and locked the front door. She then rushed to check on the victim and found blood oozing from her mouth, gaze fixed, and hands tied tightly behind her back with a telephone cord. Around her neck were a plastic bag and belt pulled taut.

[Roommate] ran to the front door, opened it, and screamed for help. A neighbor, Rosemary Asencio, appeared and while [Roommate] used her telephone to call for help, went to investigate the victim's condition. She found the young woman lying naked on her back, legs spread apart, and breasts exposed. With some difficulty she removed the plastic bag and belt from around the victim's neck and began cardiopulmonary resuscitation, which she continued until emergency medical technicians arrived about 15 minutes later.

The victim died after nine days in the hospital without ever regaining consciousness. There is no evidence that her assailant sustained any bodily injury during the episode.

Shortly after [Reed's] arrest on December 16, 1978, [Roommate] identified [Reed] in a corporeal line-up as the man who attacked her in her apartment. Two other residents at [Roommate's] apartment complex, Mikki Flanagan and

Phil Hardin, identified [Reed] at the same line-up as the person they had seen in the complex shortly before the time of the attacks on the victim and [Roommate]. Flanagan testified [Reed] came to the door of her apartment shortly after noon on November 1 and told her that he had come to check the air conditioning filters. Hardin testified he saw [Reed] in the complex around noon on November 1 wearing a red shirt and blue jeans similar to the ones [Roommate] and Flanagan testified [Reed] had worn.

A witness placed [Reed] at the scene of the instant offense immediately after [Reed] left the victim and [Roommate's] apartment. At the time of the instant offense, Ken Ezelle worked as a maintenance man at the apartment complex. Ezelle identified [Reed] at trial as the man he saw running away from the area of the victim's and [Roommate's] apartment at the same time he heard [Roommate] screaming for help.

At trial, William McLean testified that he and [Reed] were in custody together at the Dallas County Jail during May of 1982. McLean stated that on May 18, [Reed] admitted that he robbed, attempted to sexually assault and killed a woman in her apartment.

*Reed v. State*, No. 69,292, slip op. at 1-4. At trial Reed presented an alibi defense through his own testimony and the testimony of friends and family.[1]

At sentencing, the State offered evidence of Reed's prior convictions and reputation evidence. 23 SR 325-326 (prior conviction); 23 SR 328-351 (reputation). It also introduced evidence of other acts of violence by Reed. 23 SR 401-428. In particular, the State introduced evidence of another rape by Reed in which Reed attacked the victim in her apartment during the night; at one point during the assault, Reed grabbed the victim by the neck and told her he would "break her fucking neck" if she screamed. 23 SR 417. The State

---

[1]Reed was tried, convicted, and sentenced to death in an earlier trial. *State v. Reed*, Cause No. F79-1447-PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Mar. 27, 1979). The trial court granted Reed's motion for new trial, at which he was again convicted and sentenced to death. *State v. Reed*, Cause No. F79-1447-PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Nov. 21, 1980); Tr. 308.

also offered evidence that Reed led a juvenile burglary ring. 23 SR 432-439.  McLean testified that while he was a cellmate of Reed's in the Dallas County jail, Reed physically and sexually abused him. 24 SR 462-467.  Finally, Dr. James Grigson testified that Reed posed a continuing threat to society. 24 SR 498.

In his defense at sentencing, Reed offered the testimony of Dr. Wayne McLaughlin, who critiqued Dr. Grigson's testimony, 24 SR 512-518, and the testimony of two prisoners, one who had been incarcerated with Reed in both state and federal prison and said that Reed was a compliant prisoner, 24 SR 528-531, and another who was in the Dallas County jail with Reed and McLean and said he did not witness the conduct described by McLean. 24 SR 535-536.

In a separate proceeding, Reed pled guilty to the assault on the victim's roommate. The jury in Reed's capital murder trial was not informed of this.

### B. Procedural Background

The procedural history of this case is sadly long.  Reed was originally tried and sentenced to death in March 1979. *State v. Reed*, Cause No. F79-1447-PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Mar. 27, 1979).  On November 21,1980, the trial court granted Reed a new trial. *State v. Reed*, Cause No. F79-1447-PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Nov. 21, 1980); Tr. 308.  On March 22, 1983, a jury again found Reed guilty of capital murder and again answered the special issues regarding the death penalty affirmatively, and the court again sentenced Reed to death. *State v. Reed*, Cause No. F81-1988-PL (Crim. Dist. Ct. No. 5, Dallas County, Tex. Mar. 24, 1983).  Reed took his

automatic appeal to the CCA.   Six and one-half years after Reed appealed, the CCA

remanded to the trial court for a retrospective *Batson* hearing. *Reed v. State*, No. 69,292, slip

op. at 17, (citing *Reed v State*, No. 69,292 (Tex. Cr. App. Nov. 18, 1992)).   After the

retrospective *Batson* hearing, and one and one-half years after supplemental briefs were filed

in the CCA, the court affirmed Reed's conviction in an unpublished opinion on March 29,

1995.   *Reed v. State*, No. 69,292 (Tex. Cr. App. March 29, 1995).   The United States

Supreme Court denied Reed's petition for certiorari, *Reed v. Texas*, 516 U.S. 1050 (1996),

and denied rehearing.   *Reed v. Texas*, 516 U.S. 1142 (1996).

On October 14, 1996, Reed petitioned the convicting court for a writ of habeas corpus.

*Ex parte Reed*, No. 38,174-01.   On June 26, 1998, the trial court entered findings of fact and

conclusions of law recommending that habeas relief be denied (the "State Habeas Findings").

On September 16, 1998, the CCA denied habeas relief based on the State Habeas Findings.

The United States Supreme Court denied certiorari on March 22, 1999.   *Reed v. Texas*, 526

U.S. 1021 (1999).

Reed filed a preliminary habeas petition in this Court on March 23, 1999, and an

amended petition on May 4, 1999.   On October 17, 2002, the magistrate judge issued his

findings, conclusions, and recommendations that habeas relief be denied.   On February 19,

2003, another judge of this Court adopted the findings and recommendations of the

magistrate judge and entered judgment against Reed, and subsequently denied Reed's motion

to alter or amend the judgment.   Reed appealed.   While the appeal was pending, on

September 11, 2003, the case was reassigned to the undersigned judge.   On September 15,

2003, the Court of Appeals vacated the judgment without reference to the merits to permit this Court to further consider the issues raised by Reed.  By Order of January 30, 2004, the Court determined it would give no weight to the magistrate judge's earlier findings, conclusions, and recommendations, and once again commenced a de novo review of Reed's claims.  On February 24, 2005, the Court held an evidentiary hearing on certain of Reed's claims relating to McLean's testimony.

Reed's petition is subject to the amendments of the Antiterrorism and Effective Death Penalty Act of 1996.  28 U.S.C. § 2254(d) ("AEDPA").  The district court standards of review under the AEDPA and section 2254 are well-known and the Court therefore will address them only as specifically pertinent to this decision.  Reed asserts three primary claims, and several subsidiary claims.  The primary claims are that the State knowingly sponsored perjured testimony from jailhouse informant McLean, that the State violated Reed's rights under *Batson*, and that the jury charge failed to encompass Reed's mitigation evidence in violation of *Penry*.  Reed also argues several claims of procedural violations. The Court will address those claims in turn.[2]

_____

[2]Reed also asserted an actual innocence-type claim, arising out of the fact that certain fingerprints at the crime scene could not be identified, Reed's fingerprints were not found there, and three similar homicides took place after Reed was in custody.  Reed's hypothesis was that an unknown person committed all of the crimes.  Reed requested discovery regarding the fingerprints at all the crime scenes, which the Court ordered.  Reed's subsequent analysis of the fingerprints did not reveal any common prints.  The Court understands in view of that evidence that Reed is no longer making that claim.  Any actual innocence claim would be difficult to reconcile with Reed's guilty plea to the charge for assault of the victim's roommate.

## II. REED'S CLAIM THAT MCLEAN COMMITTED PERJURY

### *A. State Court Findings*

During Reed's state court habeas proceedings, the state court made extensive fact

findings on Reed's claim regarding McLean's alleged perjury:

12.    The Court recalls that McLean testified that he and [Reed] were cellmates in the Dallas County Jail in May of 1982. The Court further recalls that McLean testified that on or about May 18, 1982, he and [Reed] had a confrontation after which [Reed] told McLean about a murder he had committed which was very similar to the facts of the instant offense.

13.    The Court further recalls that McLean testified again during the punishment phase of [Reed's] trial. McLean testified to several minor assaults [Reed] had committed on him during their incarceration together. With regard to the circumstances surrounding [Reed's] oral statement on May 18, 1982, McLean testified that, prior to the statement, [Reed] had tied him up and threatened him with a razor. The Court recalls that the witness testified that [Reed] then raped McLean. After which, [Reed] began to cry, and when McLean asked him if he was going to kill him [Reed] "went into his story" about the murder. The Court recalls that McLean testified that after [Reed] made these statements to him he contacted the Dallas County District Attorney's Office.

14.    The Court finds that prior to testifying at trial, McLean had met on several occasions with Assistant District Attorney Knox Fitzpatrick. At trial, the Court recalls that McLean testified repeatedly that no one, Mr. Fitzpatrick or otherwise, ever made any promises of reward or leniency with regard to his criminal cases in exchange for his testimony against [Reed]. The Court further finds that at the time he first spoke with the lead prosecutor on [Reed's] case, Mr. Fitzpatrick, McLean had already pleaded guilty and received his sentences in his four felony cases.

15.    The Court finds that on May 19, 1986, the Dallas County District Attorney's Office received two copies of correspondence allegedly from William Samuel McLean Jr. The Court further finds that included in this correspondence was an affidavit, purportedly notarized, in which McLean recants his trial testimony.

16.     The Court finds that immediately upon receiving this "affidavit," Assistant District Attorney Jeffrey B. Keck mailed copies of it to the attorneys representing [Reed] on direct appeal.

17.     The Court recalls that on or about June 10, 1986, [Reed's] appellate attorneys filed a motion for new trial based on newly discovered evidence and a motion to abate the appeal in the Court of Criminal Appeals.  This Court denied [Reed's] motion for new trial based on its lack of jurisdiction, and the Court of Criminal Appeals denied [Reed's] motion to abate the appeal.

18.     . . .  The Court finds that William Samuel McLean Jr. is currently incarcerated at the Federal Correctional Institution in Marion, Illinois, and his parole eligibility date is January 22, 2032.

19.     The Court finds that [Reed's] first ground for relief alleges that the State's use of McLean's trial testimony violated "his Federal and State Constitutional rights to fair trial and Due Process of Law" because "his conviction rests on *knowing perjured testimony*."  Specifically, [Reed] contends that witness McLean obtained promises of assistance from the Dallas County District Attorney's Office in exchange for his testimony implicating [Reed] in the capital murder, but McLean falsely testified that no such promise existed.

. . . .

21.     The Court finds that during McLean's testimony the prosecutor, Knox Fitzpatrick, asked McLean if he was promised anything in return for his testimony.  The Court further finds that McLean repeatedly said he was not made any such promises by the Dallas County District Attorney's Office.

22.     The Court finds that, as part of his investigation, [Reed's] writ counsel hired an investigator, Jane Cracraft, to interview witness McLean at the Federal Correctional Institution in Englewood, Colorado.  The Court finds that, on September 26, 1996, Ms. Cracraft attempted to question McLean about his 1986 "recanting affidavit."  The Court further finds that McLean refused to speak with Ms. Cracraft about the "recanting" affidavit.  The Court further finds that at McLean's urging, Ms. Cracraft then spoke to Richard D. Irvin who represented himself as McLean's attorney.  At this interview, Ms. Cracraft states *she was told by Mr. Irvin* that McLean was made "some promises" by the Dallas County District Attorney's Office in return for his testimony but those promises were never fulfilled.

23.     The Court finds that the 1986 "affidavit" purporting to be from witness McLean in which he allegedly recants his 1983 trial testimony, itself, generally asserts that McLean lied at [Reed's] 1983 trial and never specifically mentions that he was made any promises by the Dallas County District Attorney's Office in return for his testimony.  (Applicant's Record Excerpt No. 3). Therefore, the Court finds that [Reed's] assertion, that a promise of consideration was made by the prosecutor to McLean in return for his testimony and that McLean was allowed to "perjure" himself in [Reed's] 1983 trial, rests solely on the hearsay statement of Richard Irvin to Jane Cracraft.

. . . .

27.     The Court finds that the actions of the prosecutors in *Napue v. Illinois* and *Giglio v. United States* are clearly distinguishable from the facts of the instant case.  In *Napue v. Illinois* and *Giglio v. United States* the prosecutors or members of the prosecution team did *in fact* make promises to the witness in exchange for their testimony.  Both Napue and Giglio presented affirmative credible evidence that such promises were made; therefore, when the witnesses denied that such promises were ever made, the witnesses clearly perjured themselves.  In the instant case, however, the Court finds that no such promises were ever made by any member of the Dallas County District Attorney's Office; therefore, the Court finds that McLean did not perjure himself when he testified that no such agreement existed.

28.     The Court finds that the record is devoid of any evidence that there was an undisclosed agreement between the Dallas County District Attorney's Office and witness McLean to provide any sort of reward or lenient treatment in exchange for his testimony implicating [Reed] in the capital murder.

29.     To the contrary, the Court finds that the record before the Court, including McLean's own testimony, McLean's correspondence with the Dallas County District Attorney's Office, and the trial testimony and subsequent affidavit of the lead prosecutor Knox Fitzpatrick clearly show that no such promise or agreement existed.

30.     The Court recalls that prior to McLean testifying, the Court held a hearing outside the presence of the jury in order to determine the admissibility of [Reed's] oral statement.  The Court recalls that in that hearing, both McLean and the lead prosecutor, Knox Fitzpatrick, detailed the circumstances of exactly how the District Attorney's Office became aware of [Reed's] confession.

31.     The Court finds that the record reflects that McLean was arrested and jailed on three aggravated robbery charges and a single arson charge in January of 1982.  The Court further finds that on May 6, 1982, with the assistance of counsel, Mike Nelson, McLean pleaded guilty to all the charges and was sentenced to fifteen years in the penitentiary on the aggravated robbery charges and two years on the arson charge.  (State's Response Exh. No. 1).  At some time prior to May 6, 1982, McLean wrote a letter to the Dallas County District Attorney's Office.  (Defense Trial Exh. No. 32).  In the letter, McLean asked to speak with someone from the Dallas County District Attorney's Office.  (Defense Trial Exh. No. 32).

32.     The Court finds that on May 7, 1982, *the day after he disposed of his felony cases*, McLean met with Assistant District Attorney, Knox Fitzpatrick, the lead prosecutor on [Reed's] case.  At that meeting, the Court finds that they discussed McLean's current situation and that the meeting concluded with *Mr. Fitzpatrick advising McLean that while the District Attorney's Office would not make him any promises with regard to any testimony he might give*, if he ever had anything to say about [Reed] and his case, the doors to the District Attorney's Office were always open.

33.     The Court finds that, within a week or two, McLean again wrote the District Attorney's Office asking to talk to Mr. Fitzpatrick.  (Defense Trial Exh. No. 33).  McLean stated that, in the time since their first meeting, [Reed] had told him about a murder.  Mr. Fitzpatrick then met with McLean, who detailed [Reed's] oral confession.  The Court finds that, again, Mr. Fitzpatrick specifically told McLean, and McLean acknowledged, that no consideration, leniency or "deal" would be made in return for his testimony.

34.     The Court finds that in a third letter dated August 30, 1982, McLean wrote to Mr. Fitzpatrick and specifically asked him to "cut his time" if he helped him.  Nevertheless, in the conclusion of his letter, McLean stated that this cut would not be in exchange for his testimony against [Reed].  The Court finds that McLean specifically stated that he would testify "for nothing at all" and "the time cut has nothing to do with the [Reed] case."  (Defense Trial Exh. No. 34).

35.     The Court recalls that [Reed's] trial counsel vigorously cross-examined McLean about the letters and the existence of any "deals" in return for his testimony.  The Court recalls that repeatedly, throughout his testimony before the Court and again in front of the jury, McLean stated that the Dallas County District Attorney's Office never made any promises of leniency or

consideration in return for his testimony against [Reed] and that his testimony was being given voluntarily and of his own free will.

36.     The Court recalls that in regard to his several meetings with witness McLean, the State's lead prosecutor, Mr. Knox Fitzpatrick, stated on the record that he never offered William Samuel McLean Jr. any reward or consideration in return for his potential testimony.  The Court recalls that Mr. Knox Fitzpatrick stated that it was his position that everything that McLean had done in regard to any testimony he would give against [Reed] was strictly voluntary on his part.

37.     The Court recalls that after reviewing McLean's testimony and the testimony of Mr. Fitzpatrick, the Court found that at their initial meeting, Mr. Fitzpatrick told McLean there was nothing he could do about his current situation and if he ever had anything to say the District Attorney's Office was always open.  The Court further recalls that as far as the Court had been able to determine McLean had not been rewarded and did not expect to be rewarded in any way for testifying at [Reed's] trial.

38.     The Court finds that in his affidavit attached to the State's response, marked as State's Exhibit No. 4, and incorporated herein, Knox Fitzpatrick, the lead prosecutor from [Reed's] 1983 capital murder trial states that he was present at every meeting between members of the Dallas County District Attorney's Office and William Samuel McLean Jr., and at no time, either before or after his testimony, was McLean ever promised any sort of consideration or leniency in return for his testimony against [Reed].

39.     Again, the Court notes that, in his writ application, [Reed] contends that the purported hearsay statement of Richard Irvin to [Reed's] investigator, Jane Cracraft – that McLean was made "some promises" by the District Attorney's Office but those promises were never fulfilled – establishes that such an agreement existed and that McLean was allowed to perjure himself at trial. The Court finds that even if such hearsay evidence was admissible in support of a habeas corpus application, it is clearly insufficient to establish [Reed's] claims.

40.     The Court finds that there is nothing in the record to indicate that the prosecuting attorney ever made any promise of consideration or leniency in return for McLean's testimony against [Reed].  As evidenced by the trial testimony of not only McLean, but also the lead prosecutor, Knox Fitzpatrick, and Mr. Fitzpatrick's subsequent affidavit, the Court finds that no such promise existed.

> 41.    Accordingly, the Court concludes as a matter of law that [Reed] has failed to proved by a preponderance of the evidence that the Dallas County District Attorney's Office violated his constitutional rights by knowingly using perjured testimony at trial in violation of the Supreme Court's holding in *Napue v. Illinois* or that the Dallas County District Attorney's Office withheld any information concerning a promise or intended promise to assist McLean in return for his testimony against [Reed], thereby violating [Reed's] constitutional rights under *Brady v. Maryland*.

*Ex parte Reed*, No. 38,174-01, R. at 648-58 (emphasis in original).  The CCA expressly adopted the trial court's findings.  *See id.* at Order (September 16, 1998).

### B. Reed's Argument

Reed argues that evidence discovered post-trial and post-state habeas shows that McLean's testimony was false in material respects, in particular, (1) that he fabricated the story of Reed's confession and (2) that he had a deal with the district attorney's office. Among other things, he relies upon McLean's affidavit recanting his testimony, on the statement of McLean's counsel to Reed's investigator, on certain medical testimony, on McLean's correspondence and on certain jail and prison records regarding McLean.  Reed has persistently and repeatedly sought an evidentiary hearing on these subjects before this Court.  The Court permitted Reed to depose McLean and then held an evidentiary hearing on those claims.[3]

-------

[3]The State argues that Reed's claim that McLean fabricated his story of Reed's confession is procedurally defaulted because Reed did not raise that in state court.  Reed argues that he was unable to develop the factual record in state court, through no fault of his own, and is thus entitled to explore and raise that claim here.  *See* 28 U.S.C. § 2254(e)(2).  In view of the Court's findings from the evidentiary hearing, the Court need not resolve that issue.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

This Court can grant relief on factual issues determined in the state court proceedings only if that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In considering Reed's evidentiary showing, "a determination of a factual issue made by a State court shall be presumed to be correct," and Reed "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

### C. This Court's Findings

The Court finds the testimony of Knox Fitzpatrick to be credible. Due to the passage of time, Fitzpatrick does not remember some things regarding the prosecution of Reed as well as other things, but he was careful to distinguish between what he remembered and what he did not. On the two critical points on these issues, Fitzpatrick was clear, direct and credible. First, the Dallas County District Attorney's office had no agreement with McLean to give him favorable treatment in exchange for his testimony regarding Reed.[4] Second, Fitzpatrick believed that McLean's testimony regarding Reed's confession to McLean was truthful. The Court accepts Fitzpatrick's testimony on these two point.

The Court has also considered the testimony of McLean, his correspondence, and other testimony regarding McLean's prior statements. One fact is apparent: McLean lies

---

[4]Fitzpatrick testified that he did not enter into any agreement with McLean, that he was present in all meetings between McLean and the District Attorney's office, that due to his role in the Reed prosecution he would have known if anyone else talked with McLean about an agreement, and that there was no such agreement.

about his involvement with Reed and Reed's trial.  Having taken virtually every possible position regarding that over time, it is likely at some point that McLean also told the truth.  As a general matter, however, the Court finds McLean's testimony to be not credible and of little probative value.   It is worth noting, however, that McLean's testimony in this proceeding, by deposition, is entirely consistent with his trial testimony that he had no agreement with the District Attorney's office regarding his testimony.

With regard to the existence of an agreement between McLean and the District Attorney's office, Reed points to McLean's letters to Fitzpatrick asserting such a deal, requesting help with the (then) Texas Department of Corrections ("TDC"), and Fitzpatrick's resulting correspondence with TDC on McLean's behalf.  Fitzpatrick's intervention for McLean is equally consistent with an assistant district attorney who was advised that a cooperating witness was in physical danger as a result of his cooperation and then made efforts to protect that witness from harm, as it is with an agreement.  The Court finds that McLean's assertion of a deal in his correspondence was not truthful and was an attempt to manipulate Fitzpatrick into assisting him.

Reed also relies on the May 6, 1982 entry on McLean's "buff card" indicating "CHAPMAN – D.A." as indicating that McLean was negotiating a deal with a person named Chapman with the Dallas County District Attorney's office.  May 6, 1982 was the day that McLean pled guilty to the charges against him.  The Court finds that the entry in question

most likely represents McLean's trip to Judge Chapman's courtroom[5] to enter his guilty plea, and does not reflect any contact by a person named Chapman with the district attorney's office to discuss a deal involving Reed.  McLean first met with Fitzpatrick the next day, May 7, 1982, *after* McLean had entered pleas and been sentenced on his state charges.

Finally, the Court notes that McLean's attorney at the time does not recall any connection between McLean's plea bargain and Reed.

The Court finds that McLean did not have any agreement with the Dallas County District Attorney's office to provide testimony against Reed in exchange for favorable treatment.  This is not a close question.  Accordingly, the Court finds that McLean's trial testimony regarding the nonexistence of such an agreement was true.  Of necessity it also follows that Reed has not shown by clear and convincing evidence that the state district court's fact findings on this point were incorrect.

The second issue is whether the District Attorney's office sponsored testimony by McLean regarding Reed's confession to McLean, knowing that the testimony was false.  Reed makes a persuasive case through expert medical testimony that the substance of McLean's testimony of Reed's confession was false.  McLean testified that Reed told McLean that a tampon was placed in the victim at the time of the assault, preventing Reed from completing his attempted sexual assault of the victim.  Reed offers medical evidence

---

[5]A magistrate sitting for Judge Keasler heard McLean's guilty plea, and apparently used Judge Chapman's courtroom for the proceeding – a practice that was common at that time.

that McLean's account was false. The Court need not determine whether McLean's testimony was false, however.

Fitzpatrick testified clearly and unequivocally that he believed McLean's testimony. The medical evidence now suggesting that McLean's testimony was false was not available to Fitzpatrick or the District Attorney's office at the time of Reed's trial. Reed offers no credible evidence that Fitzpatrick or the District Attorney's office knew then that McLean's testimony regarding Reed's confession was false. Accordingly, the Court finds that the record before it establishes clearly that Fitzpatrick and the District Attorney's office believed that McLean's testimony regarding Reed's confession was true.[6]

Under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), it is well-settled that the prosecution may not knowingly use perjured testimony. With regard to the existence of an agreement between McLean and the Dallas County District Attorney's office, the Court holds that McLean's testimony was truthful. Accordingly, Reed's *Napue* claim on that count fails. Likewise, there was no failure to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the existence of an agreement that did not exist.[7] With regard to Reed's claim that McLean's testimony regarding Reed's

---

[6]Though the Court is not required to make a harmless error analysis, the Court has no doubt that the jury would have reached the same result absent McLean's confession testimony. The principal and overwhelming evidence of Reed's guilt came from the victim's roommate and the other eyewitnesses at the scene.

[7]There likewise was no *Brady* violation from failure to disclose the "buff card," assuming it was not disclosed, because the "buff card" was not exculpatory.

confession was perjured, the Court holds that the prosecution had no knowledge of any alleged perjury by McLean. Accordingly, Reed's *Napue* claim on that count also fails.

### III. THE TEXAS COURT OF CRIMINAL APPEALS PROPERLY REJECTED REED'S *BATSON* CLAIM

*Batson v. Kentucky*, 476 U.S. 79 (1986), was decided after Reed was tried but while his case was pending on direct appeal in the CCA, and thus applies to his case. In considering Reed's *Batson* challenge, the Court is cognizant of the Supreme Court's recent decision in *Miller-El v. Dretke*, 125 S. Ct. 2317 (2005). While there may be superficial similarities between Miller-El and Reed's jury selections, there is a dispositive difference in their *Batson* claims that the Court will address below.

Reed's prosecutors struck all five black venire members using their peremptory challenges. Under the applicable law at the time, they were not required to explain the basis for their challenges, and although Reed's counsel objected and requested the trial judge to require explanation, he did not. Following *Powers v. Ohio*, 499 U.S. 400 (1991), extending *Batson* to white defendants, the CCA remanded Reed's case to the trial court for a retrospective *Batson* hearing. The trial judge, who also tried Reed's case, indicated at that hearing that he had no independent recollection of jury selection. The prosecutors also had no independent recollection of why they struck the black venire members. Instead, they testified based on their customary practices and their review of the transcript of jury selection of the questioning of the five black venire members. Counsel for Reed cross-examined the prosecutors regarding the five black venire members, but did not question them or introduce any part of the transcript regarding the balance of the panel. The only evidence of jury

selection offered at the retrospective *Batson* hearing was portions of the transcript relating to the five black venire members that were read into the record. Based on that record, the trial judge found that the State had met its burden of articulating race-neutral explanations for the strikes, and that Reed had not met his burden of proving purposeful discrimination.

On appeal, Reed for the first time attempted to offer evidence of the balance of jury selection and argue based on that evidence that the race-neutral explanations offered by the State were pretextual. The CCA declined to consider evidence that was not before the trial court. *See, e.g.*, *Reed v. State*, slip op. at 27 (Reed "pointedly did not present to the trial court argument or evidence that any disparities existed, upon which the trial court could then make its findings."). Reed argues that because the CCA declined to consider his comparative evidence, it did not adjudicate his *Batson* claim on the merits and that this Court, therefore, is free to conduct a de novo review of his *Batson* claim, including the comparative evidence. The Court disagrees.

Reed relies upon *Young v. State*, 826 S.W.2d 141 (Tex. Cr. App. 1991), which held the defendant in a noncapital case could raise a comparative argument for the first time on appeal. In *Young*, the *Batson* hearing was contemporaneous with jury selection. *Young* distinguished *Tompkins v. State*, 774 S.W.2d 195, 202 n.6A (Tex. Cr. App. 1987), *aff'd by equally divided Court*, 490 U.S. 754 (1989), a capital case in which the CCA declined to consider a comparative argument raised for the first time on appeal; the court in *Young* noted the difference in jury selection in a capital case versus a noncapital case and noted that the

OPINION – PAGE 19

defendant in *Tompkins* did not request the trial court to take judicial notice of the jury selection proceedings or call his attention to any of the evidence from those proceedings.

This case presents an even stronger case than *Tompkins* for the CCA's declining to consider Reed's comparative evidence and argument. First, the *Batson* hearing here was not part of the trial and contemporaneous with jury selection; it was a separate evidentiary hearing held years later. At the *Batson* hearing, Reed neither offered any evidence of the voir dire nor requested the trial judge to take judicial notice of that record. Reed thus was not merely asking the CCA to consider a new *argument* that was latent in the evidentiary record before the trial court, he was asking the CCA to consider a new argument based on *new evidence* that was not before the trial court at the *Batson* hearing. Second, the trial judge here expressly put Reed on notice that the judge had not reviewed the record from voir dire and did not have any independent recollection of jury selection. Under these circumstances, this Court cannot say that the CCA failed to follow Texas procedure when it did not permit Reed to supplement the evidentiary record from the *Batson* hearing on appeal.

Of course, in exercising habeas jurisdiction, assessing Texas procedure is not within this Court's purview. Both the trial court and the CCA addressed Reed's *Batson* claim on the merits and rejected it.[8] Under those circumstances, this Court's inquiry is limited to deciding whether the adjudication of Reed's *Batson* claim "resulted in a decision that was

---

[8]Indeed, the CCA's opinion devotes some 19 pages to Reed's *Batson* claim. *See Reed v. State*, slip op. at 15-34.

based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*." 28 U.S.C. § 2254(d)(2) (emphasis added).

It is this factor that distinguishes Reed's case from *Miller-El*. In *Miller-El*, "[t]here can be no question that the transcript of *voir dire*, recording the evidence on which Miller-El bases his arguments and on which [the Supreme Court] base[d] [its] result, was before the state courts . . . ." *Miller-El*, *supra*, 125 S. Ct. at 2326 n.2. Likewise, with regard to the consideration of juror questionnaires and juror information cards, in *Miller-El*, "[t]he State raised no objection to receipt of the supplemental material in the District Court or the Fifth Circuit, and in [the Supreme] Court the State has joined with Miller-El in proposing that we consider this material . . . . Neither party has referred to the provision that the reasonableness of the state-court determination be judged by the evidence before the state court, 28 U.S.C. § 2254(d)(2), and it is not clear to what extent the lodged material expands upon what the state judge knew . . . ." *Id.* at 2334 n.15.

Here, in contrast to *Miller-El*: (1) the full transcript of voir dire was not before the trial court; (2) the State has objected to considering evidence not before the trial court in the *Batson* hearing, *see* Respondent Johnson's Answer and Motion for Summary Judgment with Brief in Support at 25 ("in order to preserve a claim of pretext for subsequent review, the defendant must have raised the issue and its evidentiary support at the time of the *Batson* hearing") ; (3) the State expressly relies on the 28 U.S.C. § 2254(d)(2) requirement that this Court review state court adjudications "in light of the evidence presented in the State court proceeding," *see id.* at 10; and (4) it is clear that at the time of the *Batson* hearing, the state

court judge had no independent recollection of the voir dire, aside from that limited portion that was introduced at the *Batson* hearing.  Thus, a doubly-retrospective[9] comparative analysis, like the one the Supreme Court used in *Miller-El*, cannot be made here.

Because the evidence Reed presented in the State court proceeding did not include the complete record of the jury selection proceedings, the trial court's finding that Reed had not carried his burden of proving purposeful determination was not an unreasonable determination of the facts in light of the evidence presented at the retrospective *Batson* hearing.  Reed has failed to rebut by clear and convincing evidence the presumption that the trial court's factual determination of Reed's *Batson* claim was correct.  *Id.* § 2254(e)(1).  Accordingly, the State is entitled to summary judgment on Reed's *Batson* claim.

## IV. THE COURT OF CRIMINAL APPEALS REASONABLY ADDRESSED REED'S *PENRY* CLAIM

On November 10, 2004, Reed moved for leave to amend his petition to add a *Penry* claim in view of the then-recently-decided *Tennard v. Dretke*, 542 U.S. 274 (2004).  On April 21, 2005, the Court granted Reed's motion for leave.[10]  Reed argues that the trial court's jury charge did not give the jury a sufficient vehicle to express a reasoned moral response to Reed's mitigation evidence.  Reed's mitigation evidence dealt with (1) his prior

---

[9]Doubly-retrospective in the sense that Reed's *Batson* hearing was long after the trial, and that Reed's comparative argument was first made long after, and outside the record of, the *Batson* hearing.

[10]At the Court's direction, the State has filed its answer and Reed has replied.  Neither side has requested to expand the record, and this issue does not raise any disputed questions of fact.  It is thus ripe for disposition on the pleadings.  *See* FED. R. CIV. P. 12(c).

conduct while in prison, (2) his nonviolent criminal history, (3) his abnormal family life, and (4) his sociopathic personality. *Reed v. State*, slip op. at 7-8. The trial court asked the jury to answer the following three special issues:

SPECIAL ISSUE I

Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

SPECIAL ISSUE II

Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

SPECIAL ISSUE III

Was the conduct of the defendant in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

Reed raised his challenge to the jury instructions on his direct appeal, which the CCA rejected. The issue is thus properly exhausted and before this Court.[11]

**A. Evolution of Penry in the Supreme Court**

The Court will briefly recap the Supreme Court's *Penry* jurisprudence. In *Jurek v. Texas*, 428 U.S. 262 (1976), the Supreme Court upheld Texas' special issues on capital punishment, article 37.071 of the Texas Code of Criminal Procedure, noting that "the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Id.* at 272. In *Franklin v. Lynaugh*, 487 U.S. 164 (1988), the Supreme Court held that Texas' special issues adequately permitted the jury to consider mitigating evidence of the defendant's good prison record. *See id.* at 179

---

[11]It is not clear why the third special issue was given, as there was no evidence that the victim provoked Reed. Neither side claims it is pertinent to Reed's *Penry* claims, and the Court will not further consider it.

("We are thus quite sure that the jury's consideration of petitioner's prison record was not improperly limited.").

In *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"), the Supreme Court considered Penry's claim that the first two special issues did not give sufficient effect to Penry's mitigating evidence of mental retardation and a history of abuse. The Supreme Court first held that the first "deliberate" special issue, without special instruction, would not encompass Penry's mitigation evidence. *Id.* at 323. It then observed: "Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Id.* at 324. Thus, the second special issue did not adequately encompass Penry's mitigation evidence. *Id.* The Court thus remanded for resentencing.[12]

In response to *Penry I* the Fifth Circuit developed a mitigation jurisprudence requiring mitigation evidence to be "constitutionally relevant" and to have a nexus to the offense

---

[12]On remand the trial court gave a "nullification" or supplemental instruction, instructing the jury to answer one of the special issues "no" if they felt that Penry's mitigation evidence justified that result, although the written special issues remained the same. In *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"), the Supreme Court rejected the nullification instruction. The Court held that if the nullification instruction told the jury to consider mitigation evidence only in reaching its answers to the three special issues, then "because the supplemental instruction had no practical effect, the jury instructions at Penry's second sentencing were not meaningfully different from the ones we found constitutionally inadequate in *Penry I*." *Id.* at 798. Alternatively, if the jury were to understand the nullification instruction to direct an answer to a special issue contrary to the evidence, if they felt the mitigation evidence called for a lesser sentence, then the nullification instruction "made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation." *Id.* at 799. Because of this conflict in the instructions, "[t]he supplemental instruction therefore provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Id.* at 800.

conduct.  *See, e.g.*, *Smith v. Cockrell*, 311 F.3d 661, 680 (5th Cir. 2002); *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), *aff'd* 506 U.S. 461 (1993).  The Supreme Court rejected this Fifth Circuit jurisprudence in *Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562 (2004).

The Supreme Court first held that the Fifth Circuit's constitutional relevance and nexus "test has no foundation in the decision of this Court."  *Id.* at 2570.  The Court then held that "[r]easonable jurists could conclude that the low IQ evidence Tennard presented was relevant mitigating evidence," and that "[r]easonable jurists also could conclude that the Texas Court of Criminal Appeals' application of *Penry* to the facts of Tennard's case was unreasonable.  The relationship between the special issues and Tennard's low IQ evidence has the same essential features as the relationship between the special issues and Penry's mental retardation evidence.  Impaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately."  *Id.* at 2572.  The Court thus held that Tennard was entitled to a certificate of appealability and remanded for further proceedings consistent with its opinion.[13]

---

[13]Most recently, in *Smith v. Texas*, ___ U.S.___, 125 S. Ct. 400 (2004) (per curiam), the Supreme Court applied *Tennard* and *Penry II* in the context of a grant of certiorari from a direct appeal to the CCA.  Smith offered mitigating evidence of learning disability, low IQ, good behavior at school, disadvantaged family background, and young age.  The trial court gave the jury the first two standard Texas special issues together with a nullification instruction.  The CCA had followed the Fifth Circuit's lead and applied a constitutional relevance inquiry, shortly before the Supreme Court decided *Tennard*.  The Supreme Court rejected that threshold inquiry in reliance on *Tennard*, *id.* at 404-05, and rejected the nullification instruction in reliance on *Penry II.  Id.* at 405-07.  *Smith* does not appear to make any new law or extend *Tennard* or *Penry II.*

## B. Post-*Tennard* *Jurisprudence in the Fifth Circuit*

The Fifth Circuit has addressed *Penry* issues in four published[14] opinions since *Tennard* and *Smith*. First, in *Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005), the Court considered a supplemental or nullification instruction. Bigby offered mitigating evidence that he suffered from severe mental illness that could not be controlled with medication. *Id.* at 566-67. The Court observed:

> The Court has found a supplemental instruction, like the one present in Bigby's trial, to be unconstitutional only where the special issue questions themselves are not broad enough to provide a vehicle for the jury to give effect to the defendant's mitigation evidence. *Robertson v. Cockrell*, 325 F.3d 243, 258 (5th Cir. 2003) (finding that where the Texas special issues allow the jury to give mitigating effect to the proffered evidence, the presence of the supplemental instruction cannot constitute error). When the jury is able to consider and give effect to the mitigation evidence in imposing sentence, the special issue questions are constitutionally adequate. *Penry II*, 532 U.S. at 797 (quoting *Johnson*, 509 U.S. at 381 (O'Connor, J., dissenting) ("[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances")). Thus, in considering a *Penry II* claim, the court must ask whether the evidence is beyond the effective reach of the jury
>
> We are aware of the precedent in this Circuit that evidence that a petitioner was suffering from schizophrenia at the time of the crime may be considered under the first interrogatory; or alternatively, that mitigation evidence of schizophrenia may be considered under the future dangerousness special issue, if the schizophrenia can be controlled or goes into remission. However, we find those cases to be distinguishable.

*Id.* at 570-71 (emphasis in original).

First, the Court distinguished *Lucas v. Johnson*, 132 F.3d 1069 (5th Cir. 1998):

---

[14]The Fifth Circuit addressed *Tennard* in an unpublished decision finding a certificate of appealability should issue on a *Penry* claim following *Tennard*. *See Mines v. Dretke*, 118 Fed. Appx. 806, 815-16 (5th Cir. 2004). That decision did not reach the merits, and the case is awaiting oral argument, currently set for August 31, 2005. Obedient to Fifth Circuit Rule 47.5.4, the Court will not further consider *Mines*.

The *Lucas* court held that a sentencer could give effect to that testimony under the first interrogatory since it went to whether he acted deliberately when he committed the murder. Although Bigby's history of mental illness was relevant to whether he acted deliberately, it also spoke to his moral culpability. Importantly, Bigby's evidence indicated that his schizophrenia was chronic and severe, caused him to suffer delusions with respect to the actions and motivations of the people around him, could not be adequately treated, and significantly impacted his interpersonal relationship abilities. Inquiry into whether Bigby acted deliberately fails to fully account for the potential impact such a debilitating condition might have upon the jury's perception of Bigby's moral responsibility for his crimes. Thus, as in *Penry I*, the first interrogatory did not adequately allow the jury to consider the effect of this evidence upon Bigby's personal culpability.

*Id.* at 571 (footnote omitted). The Court then further distinguished *Lucas* and *Hernandez v. Johnson*, 248 F.3d 344 (5th Cir. 2001), on the basis that Bigby's evidence of mental illness could not be encompassed in the future dangerousness issue because his illness could not be controlled. *Id.* Having found the special issues did not adequately encompass Bigby's mitigation evidence, the Court easily found that supplemental or nullification instruction was controlled by *Penry II* and *Smith* and ordered the district court to grant Bigby habeas relief and set aside his sentence. *Id.* at 571-72.

The Fifth Circuit next addressed *Tennard* in *Brewer v. Dretke*, 410 F.3d 773 (5th Cir. 2005). The Court observed:

[A]t trial, Brewer introduced a variety of mitigating evidence, including the following facts: that he had a bout with depression three months before the murder; that he was briefly hospitalized for that depression; that his co-defendant, a woman with whom he was apparently obsessed, dominated and manipulated him; that he had been abused by his father; that he had witnessed his father abuse his mother; and that he had abused drugs.

*Id.* at 777. The Court then held:

> This circuit has accepted a distinction between mental retardation and
> mental illness. A mental illness inquiry does not warrant any sort of
> adjustment to the standard two-pronged interrogatory, and we have rejected
> habeas petitions on these grounds on a number of occasions. We have
> likewise rejected claims that mitigating evidence pertaining to substance
> abuse, without an adjustment to the sentencing issues, can support a *Penry*
> violation. Although we decline to revisit specifically the rationale in each of
> these cases, it is sufficient to say that generally they stand for the proposition
> that, even under the two-pronged special issue methodology, a jury can
> adequately incorporate evidence of mental illness and substance abuse into its
> decision calculus.

*Id.* at 778 (footnotes omitted). The Fifth Circuit accordingly reversed the district court's

grant of habeas relief and rendered judgment denying relief.

The Fifth Circuit again considered a *Penry* claim in *Coble v. Dretke*, ___ F.3d ___,

No. 01-50010, 2005 WL 1663882 (5th Cir. July 18, 2005). *Coble* again dealt with a trial

between *Penry I* and *Penry II*, and the use of a supplemental or nullification instruction. The

Court summarized Coble's mitigation evidence:

> First, he presented nonpsychiatric mitigating evidence, including evidence of
> his troubled childhood; that his father died before he was born; that his mother
> suffered a nervous breakdown when he was eleven; and that he was sent to live
> at a state facility. Coble lived at the orphanage until he was seventeen, at
> which point he joined the Marines and served in Vietnam. During his four
> years of service, Coble served as a machine gunner and was involved in
> combat. Upon his return to the United States, Coble was hospitalized due to the
> to trauma he experienced during the war. Likewise, Coble's sister testified
> that he was different after he returned from Vietnam. Coble offered testimony
> that he was involved with various youth programs over the years, that he had
> a good relationship with his son, and that he got along well with his co-
> workers. Coble also served as a section leader in the U.S. Army reserves and
> he offered evidence that he was well respected.

*Id.* at *11. The Court then summarized the testimony of two defense psychiatrists, one who

testified that he had post-traumatic stress disorder and bipolar disorder, which caused mood

swings and loss of control on the day of the murders, and which could be controlled with medication, and another who testified that Coble was suffering from severe depression at the time of the offense and was unlikely to be dangerous in the future.  *Id.* at *11-*12.

The Court first addressed Coble's mental illness.  "This Circuit has previously held that mitigating evidence of mental illness could be considered within the context of the second special issue, future dangerousness, if the illness can be controlled or go into remission."  *Id.* at 13.  The Court distinguished *Bigby*, "where we found that Bigby's mitigation evidence of his mental illness could not be considered within the context of the future dangerousness special issue because the evidence indicated that his condition could not be adequately controlled or treated."  *Id.*

The Court next addressed Coble's troubled childhood.  Following *Jacobs v. Scott*, 31 F.3d 1319 (5th Cir. 1994) and *Graham v. Collins*, 506 U.S. 461 (1993), the Court distinguished the degree of troubled childhood from Penry's: "Coble had a troubled childhood similar to that of Jacobs and Graham, 'as opposed to a childhood rife with harsh physical abuse like that of Penry.'" *Coble*, at *14 (citing *Jacobs*, 31 F.3d at 1327).  "Therefore, we reject his contention that the Texas special issues did not provide an adequate vehicle for the jury to make a reasoned moral response to Coble's mitigating evidence of his troubled childhood."  *Id.*

The Court then addressed Coble's evidence of good character.  "Evidence of good character tends to show that the crime was an aberration, which may support a negative answer to the special issue regarding the future dangerousness of the defendant.  Therefore,

as this court has previously held, good character evidence can find adequate expression under the second special issue." *Id.* (citations and internal quotations and brackets omitted).

The Court then considered the first special issue. It first concluded that an additional definition given by the state trial court of "deliberateness" was rejected in *Bigby* as curing the *Penry* defect. The Court then considered whether the first special issue could encompass the mitigating effect of Coble's childhood and mental illness, and considered the tension between *Bigby* and *Lucas*. The Court found it unnecessary to resolve that question:

> Having determined that the jury had an adequate means, through the second special issue, to consider Coble's mitigating evidence of mental illness, we need not consider whether the first special issue provides another, separate, adequate means. We therefore decline to determine when the first special issue provides a vehicle with which to consider the mitigating evidence of mental illness, as in *Lucas*, as opposed to where the "deliberateness" special issue fails to adequately allow the jury to consider the effect of this evidence, as in *Bigby*.

*Id.* at *15.[15]

The Fifth Circuit most recently considered *Penry* and *Tennard* in *Cole v. Dretke*, ___ F.3d ___, No. 01-10646 (5th Cir. July 22, 2005). *Cole* was back before the Fifth Circuit on remand from the Supreme Court in light of *Tennard*; the Fifth Circuit had previously denied Cole a certificate of appealability. *See id.*, slip op. at 5. The Fifth Circuit quickly concluded that Cole offered relevant mitigating evidence and that a certificate of appealability should be issued. The Court then considered the merits of Cole's *Penry* claims and denied relief.

---

[15]The Court notes that no member of the *Bigby* panel (Higginbotham, DeMoss, and Stewart, JJ.) was on the *Brewer* panel (Jolly, Smith, and Garza, JJ.), though the author of *Bigby* (Stewart, J.) was on the panel in *Coble* (Jolly, Garza, and Stewart, JJ.).

Cole offered mitigating evidence of destructive family background and neurological

deficiency.  The destructive family background evidence showed:

A.   Cole's mother was an alcoholic who was unable to care for her children.
B.   Cole's father was arrested for trying to rob a liquor store.
C.   Cole's father deserted the family when Cole was five years old.
D.   Cole's mother then moved with her children to her parents' home.
E.   Cole's grandparents were alcoholics who did not want the children to live with them.
F.   Cole was isolated from other children because his grandparents' home was eight miles out of town.
G.   School buses did not run to the grandparents' home, and the grandparents did not allow Cole's mother to use their car to take Cole to school.
H.   Cole was placed in a children's home at the age of five.
I.   During Cole's five years in the home, his mother visited him only twice.
J.   Cole's father never visited him at the home.
K.   Cole's uncle adopted Cole's brother, but not Cole.

*Id.*, slip op. at 9-10.  The evidence of "organic neurological deficiency" showed that Cole

lacked impulse control.  *Id.*, slip op. at 12.

After recapping pertinent Supreme Court cases, the Fifth Circuit held that Texas'

special issues were "broad enough to encompass Cole's mitigating evidence."  *Id.*, slip op.

at 20.  The Fifth Circuit first distinguished the facts in *Cole* from *Penry I* and *II*, based on

*Johnson v. Texas*, 509 U.S. 350 (1993).  The Fifth Circuit cited *Johnson* for the proposition

that the salient fact in *Penry* was that Penry's mental retardation prevented him from learning

from his mistakes, which thus caused his mitigation evidence to have only aggravating effect

under Texas' future dangerousness special issue.  *Cole*, slip op. at 21.  Cole's mitigation

evidence, in contrast, showed that his behavioral issues would lessen as he aged.  *Id.* at 22-

23.  Based on this, the *Cole* court found this permitted Cole's mental health evidence to fit within the second special issue, *id.* at 24, and to also distinguish *Bigby*.  *Id.* at 24 n.54.

The *Cole* court then ruled that Cole's family background evidence fit within Texas' special issues, based on *Graham v. Collins*, 506 U.S. 461 (1993).  *Cole*, slip op. at 24-25. Finally, the *Cole* court held that the supplemental instruction given by the state trial court avoided the defects of the "nullification" supplemental instruction addressed in *Penry II* and *Smith*, and more similar to the one approved in *Johnson*.  *Id.*, slip op. at 25-32.  Because the supplemental instruction issue is not involved in this case, this Court will not further address that part of the *Cole* analysis.

### C. Disposition of the Court of Criminal Appeals

The CCA in its disposition of Reed's *Penry* claim first noted that he offered mitigating evidence on "his prior conduct while in prison, his nonviolent criminal history, his abnormal family life, and his sociopathic personality . . . ." *Reed v. State*, slip op. at 7.  The court then articulated what it understood to be the governing standard:

> We will determine whether, in the absence of instructions informing them that they could consider and "give effect" to appellant's mitigating evidence, the jury was presented with a vehicle for expressing a "reasoned moral response" to that evidence in reaching its verdict.  In resolving this question, we must determine whether appellant's "relevant mitigating evidence" was placed beyond the factfinder's effective reach.
>
> After reviewing the evidence cited by appellant in his brief to this Court, we find that it does not rise to the level that would require a special instruction on mitigating evidence.  Appellant's evidence was not comparable to the "two-edged sword" evidence of organic brain damage and mental retardation found in *Penry*.  Appellant's relevant mitigating evidence was not completely beyond the factfinder's effective reach.  The jury in the instant case could express a reasoned moral response to appellant's mitigating evidence within the context of the statutory instructions given to them by the trial court.

*Id.* at 8-9 (citations omitted).

The CCA first considered Reed's evidence of good behavior, holding it was within the effective reach of the jury in the context of the future dangerousness issue. *Id.* at 9. The CCA then considered Reed's argument that his prior criminal activity was nonviolent. While expressing some understandable skepticism regarding that claim, the court held that it also could be considered "within the scope of the second special punishment issue." *Id.* at 10. The CCA next considered Reed's evidence of "turbulent family background," *id.*, and likewise found it was within the scope of the future dangerousness issue. *Id.* at 11.

The CCA then reviewed the psychiatric testimony:

> Fourth, appellant set out the testimony of the psychiatric experts who testified at the punishment stage of his trial. The State's expert, Dr. Grigson, testified that appellant was a sociopath, possessing a "sexual deviant, anti-social personality disorder." Grigson and Dr. McLaughlin, appellant's expert, agreed that this psychological tendency to violence would have a period of ascendancy, followed by a period of burnout between the ages of thirty and forty. Based upon Grigson and McLaughlin's testimony, appellant argued that his violent behavior would reduce with aging and incarceration during this period. We find that the jury was allowed under the second special issue to give consideration to the mitigating effect of this evidence of the potential burnout of appellant's sociopathy, and find that because of it he would not pose a future threat to society. This evidence was relevant to the statutory special issues, specifically the second special issue. It was not beyond the effective reach of the factfinder. We conclude that the jury was able to express a reasoned moral response to this evidence during the instant trial.

*Id.* at 11-12 (citation omitted). Finally, having addressed all four of Reed's claims of mitigating evidence, the CCA made this additional observation: "Additionally, appellant fails to show a nexus between his mitigating evidence and the facts of the instant offense.

Appellant has not shown that his mitigating evidence tends to excuse or explain his criminal act." *Id.* at 12 (citation omitted). The CCA thus rejected Reed's *Penry* claim.

### D. Standard of Review

The AEDPA provides in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The statutory phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 412. "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applies clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11 (emphasis in original). *Accord*

*Wiggins v. Smith*, 539 U.S. 510, 520 (2003) ("In order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.").[16]

### E. Review of the Court of Criminal Appeals' Disposition

As noted by the CCA, Reed offered four categories of mitigating evidence: his prior conduct while in prison, his nonviolent criminal history, his abnormal family life, and his sociopathic personality.  Reed's evidence of prior conduct while in prison and his (questionably) nonviolent criminal history are evidence suggesting good character.  As the Fifth Circuit recently reaffirmed in *Coble*:

> "Evidence of good character tends to show that the crime was an aberration, which may support a negative answer to the special issue regarding the future dangerousness of the defendant."  *Boyd v. Johnson*, 167 F.3d 907, 912 (5th

---

[16]Thus, in measuring Reed's state court determinations against clearly established federal law, this Court measures against the Supreme Court, rather than the Fifth Circuit.  *See* 28 U.S.C. § 2254(d)(1); *Magouirk v. Phillips*, 144 F.3d 348, 361 (5th Cir. 1998) ("state courts are not bound by Fifth Circuit precedent when making a determination of federal law"); *Lindh v. Murphy*, 96 F.3d 856, 869 (7th Cir. 1996) ("This is a retrenchment from former practice, which allowed the United States courts of appeals to rely on their own jurisprudence in addition to that of the Supreme Court.").  However, Fifth Circuit precedent "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'"  *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000).  This Court is conscious, however, that in measuring a state court decision against Supreme Court precedent, it is answering a legal question, and the Fifth Circuit will review this Court's answer by "conduct[ing] a *de novo* inquiry to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court precedent."  *Brewer, supra*, 410 F.3d at 775.  One assumes this *de novo* inquiry *will* comport with Fifth Circuit precedent.  Accordingly, this Court will put on its jurisprudential bifocals, attempting to focus on both the Supreme Court and the Fifth Circuit, and review the CCA's disposition of Reed's *Penry* claims.

Cir. 1999).  Therefore, as this court has previously held, "[good character] evidence can find adequate expression under [the] second special issue." *Barnard v. Collins*, 958 F.2d 634, 640 (5th Cir. 1992).  *See also Boyd*, 167 F.3d at 912; *Graham*, 950 F.2d at 1032-33.

*Coble, supra*, 2005 WL 1663883, at \*14 (brackets in original).  Thus the CCA correctly addressed Reed's evidence of good character.

Next, Reed offered evidence of a troubled childhood.  As the CCA noted:

He did not finish high school, dropping out in the eleventh grade.  Appellant was first sent to the penitentiary at the age of nineteen.  His step-mother married his father when he was twenty-four.  At the time of the offense, he had no permanent home and was staying off and on with his parents.

*Reed v. State*, slip op. at 10.  The Fifth Circuit apparently evaluates such evidence based on the degree of troubled childhood.  In *Jacobs v. Scott*, 31 F.3d 1319, 1327 (5th Cir. 1994), the Court considered evidence that Jacobs "never knew his mother, and has only vague memories of his father.  His father left him to live alone with strangers when he was a small boy, and Mr. Jacobs never saw him again.  Mr. Jacobs ended up living in several foster homes as a child, separated from his sister, parents, and all other family connections."  In *Coble*, the Court noted that "Coble's evidence of his troubled childhood included: (1) the death of his father before he was born; (2) poverty in childhood; (3) his stepfather's alcoholism and conflicts with his mother; and (4) his mother's nervous breakdown."  2005 WL 1663883, at \*14.  The Court found that to be of a degree "similar to that of Jacobs . . . 'as opposed to a childhood rife with harsh physical abuse like that of Penry.'" *Id.* (quoting *Jacobs, supra*, 31 F.3d at 1327).  The Court concluded: "Coble's evidence is distinguishable from that in *Penry*.  Therefore, we reject his contention that the Texas special issues did not

provide an adequate vehicle for the jury to make a reasoned moral response to Coble's mitigating evidence of his troubled childhood."   The Court in *Cole* reached in similar conclusion based on a record there of a destructive family background more extreme than Reed's.   *Cole*, slip op. at 9-10.   The evidence of Reed's troubled childhood here is not constitutionally distinguishable from that of Cole, Coble, and Jacobs, and thus *is* distinguishable from that in *Penry*.   Accordingly, this Court must likewise reject Reed's *Penry* claim regarding his troubled childhood.[17]

Finally, the Court turns to Reed's mitigating psychiatric evidence.   The CCA addressed that claim as follows:

> The State's expert, Dr. Grigson, testified that appellant was a sociopath, possessing a "sexual deviant, anti-social personality disorder."   Grigson and Dr. McLaughlin, appellant's expert, agreed that this psychological tendency to violence would have a period of ascendancy, followed by a period of burnout between the ages of thirty and forty.   Based upon Grigson and McLaughlin's testimony, appellant argued that his violent behavior would reduce with aging and incarceration during this period.   We find that the jury was allowed under the second special issue to give consideration to the mitigating effect of this evidence of the potential burnout of appellant's sociopathy, and find that because of it he would not pose a future threat to society.

*Reed v. State*, slip op. at 11.   This issue is controlled by *Coble* and *Lucas*, rather than *Bigby*.

The evidence was that Reed's dangerousness would "go into remission" as he aged.   *Bigby*, 402 F.3d at 551 (distinguishing *Lucas* and *Hernandez v. Johnson*, 248 F.3d 344, 349 (5th Cir.

---

[17]As the CCA noted on this point: "Sympathetic as we may be to his plight during childhood and adolescence, we do not think appellant might rationally be found less morally culpable for his adult behavior on this basis, according to contemporary moral values as shared by a significant segment of our society."   *Reed v. State*, slip op. at 11 (quoting *Draughon v. State*, 831 S.W.2d 331, 338-39 (Tex. Cr. App. 1992)).

2001)).  As in *Coble*, that makes Reed's mental illness evidence cognizable under the second special issue; the Fifth Circuit in *Cole* reached a similar conclusion based on similar evidence that Cole would become less dangerous as he aged.  *Cole*, slip op. at 21-24.  Thus, the Court need not consider whether or not any reduction in moral culpability due to that illness is also cognizable under the first special issue.  *Coble*, 2005 WL 1663882, at *15-*16.  Accordingly, this Court does not find that the CCA's determination to reject Reed's *Penry* claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2554(d)(1).[18]

## V. PROCEDURAL CLAIMS

### A. Dual Theories

Reed argues that the jury was permitted to convict him under alternate theories that he murdered the victim either in the course of committing or attempting to commit robbery or in the course of attempting to commit aggravated rape, in violation of his rights under the Sixth, Eighth and Fourteenth Amendments.  Reed raised this claim on his direct appeal and it was rejected by the CCA.  *See Reed v. State*, slip op. at 68-71.  "Where a statute creates a single offense, such as Tex. Penal Code Ann. § 19.03, the different acts by which that offense may be committed may be alleged in the same count of an indictment."  *Id.* at 70.  Thus, the

---

[18]Although the CCA then referred to the discredited "nexus," it expressly addressed that argument "[a]dditionally."  *Reed v. State*, slip op. at 12.  While that additional ground for its decision is not viable after *Tennard*, that does not affect that balance of its decision discussed above.

jury was not charged here with two different offenses in the alternative, but rather with two alternate means of committing the offense of capital murder. *See Jernigan v. State*, 661 S.W.2d 936, 942 (Tex. Cr. App.), *cert. denied*, 464 U.S. 986 (1983). The CCA's disposition on this point counts as a disposition on the merits under the AEDPA and receives the deference required by the AEDPA. *See Dowthitt v. Johnson*, 230 F.3d 733, 756-57 (5th Cir. 2000). The CCA's determination of this issue does not conflict with United States Supreme Court precedent on this point. *See Schad v. Arizona*, 501 U.S. 624, 644 (1991). Accordingly, the State is entitled to summary judgment on this claim.

## B. Circumstantial Evidence

Reed argues that application of a change in Texas law regarding the need for a jury instruction on circumstantial evidence between the time of the offense and his trial violates the constitutional prohibition of ex post facto laws. At the time of Reed's offense, Texas law required an instruction on the law of circumstantial evidence. In *Hankins v. State*, 646 S.W.2d 191 (Tex. Crim. App. 1981), the CCA eliminated the need for that instruction. Reed argues that that change violates the ex post facto prohibition, citing *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964). The state district court rejected this claim in its habeas ruling. It held: "The Court concludes as a matter of law that the procedural rule announced in *Hankins* did not increase applicant's liability for any acts he committed, did not increase the punishment for his crime, and did not deprive him of any defense that was available at the time the crime was committed." *State v. Reed*, Findings of Fact, Conclusions of Law, and Order ¶ 146 (Dallas County Criminal District Court No. 5, June 26, 1998).

Before this Court, Reed has failed to show that the state court's legal analysis "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Accordingly, the State is entitled to summary judgment on Reed's claim of violation of the ex post facto prohibition.

### C. Reasonable Doubt Instruction

Reed also argues that his Fourteenth Amendment rights to due process and equal protection were violated by the CCA when it failed to apply an intervening decision on direct appeal to Reed's properly preserved claim that the trial court should have instructed the jury on reasonable doubt.  At the time of Reed's trial, no definition of reasonable doubt was required.  In *Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991), while Reed's direct appeal was pending, the CCA required a jury instruction on reasonable doubt; the CCA declined to apply the new *Geesa* rule to Reed, and on rehearing rejected his argument that the court's disposition violated his due process and equal protection rights under the Fourteenth Amendment.  As Reed notes, the Fifth Circuit has rejected his argument.  *See Earhart v. Johnson*, 132 F.3d 1062, 1068 (5th Cir. 1998); *Lackey v. Scott*, 28 F.3d 486 (5th Cir. 1994).  Accordingly, the State is entitled to summary judgment on Reed's claim regarding a reasonable doubt instruction.

### D. Due Process and Appellate Delay

Reed argues that the significant delay by the CCA in resolving his direct appeal denied him due process.  This Court certainly does not endorse the length of time it took the

CCA to resolve Reed's appeal.  It is possible that the court was awaiting developments in the wake of *Batson* to resolve the appeal.  Although *Batson* itself was decided early in the pendency of Reed's appeal, it was not until *Powers v. Ohio*, 499 U.S. 400 (1991), that the Supreme Court clarified that a *Batson* challenge could be made by a white defendant to the striking of black venire members, and it was not until April 6, 1992, that the Court held *Powers* would apply in all cases pending on direct appeal.  *Trevino v. Texas*, 503 U.S. 562 (1992).  The CCA remanded Reed's case for a retrospective *Batson* hearing only seven months after *Trevino*.  Although the CCA provided no explanation for its delay, the development of the case law following *Batson* certainly could have been part of the reason.

It appears to the Court that the bulk of any prejudice arising from the delay fell on the State.[19]  By the time of the retrospective *Batson* hearing, the prosecutors had forgotten why they exercised their peremptory challenges.  They were forced to defend against Reed's prima facie case based on their memories of their customary practices and a review of the transcript from jury selection.

The state trial court considered Reed's claim of a due process violation due to appellate delay, and "conclude[d] as a matter of law that a showing of substantial prejudice to the appellate process is a necessary condition for granting habeas relief when the constitutional right to a speedy appeal is violated."  *State v. Reed*, Findings of Fact, Conclusions of Law, and Order ¶ 160 (Dallas County Criminal District Court No. 5, June 26,

---

[19]Indeed, Reed has arguably been helped by the passage of time.  *See Batson*, *supra*; *Miller-El*, *supra*; *Tennard*, *supra*; *Smith*, *supra*.

1998).  The court further concluded "that once a criminal defendant's appeal has been adjudicated, he must prove the appellate court's delay in processing his appeal substantially prejudiced the disposition of his appeal in order to receive any further habeas corpus relief." *Id.* ¶ 161.  After reviewing the chronology of Reed's appeal, the court "conclude[d] as a matter of law that [Reed] has failed to prove by a preponderance of the evidence that any delay by the CCA in adjudicating his mandatory direct appeal substantially prejudiced his appeal in any manner." *Id.* ¶ 170.

Before this Court, Reed has failed to show that the state court's legal analysis "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), and has failed to rebut by clear and convincing evidence the presumption that its fact findings were correct.  Accordingly, the State is entitled to summary judgment on Reed's due process claim based on appellate delay.

### E. Eighth Amendment and Appellate Delay

Reed also claims that the appellate delay violates his Eighth Amendment right to be free from cruel and unusual punishments.  The state trial court concluded that such a claim was not legally valid, citing *Fearance v. Scott*, 56 F.3d 633 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995).  Before this Court, Reed has failed to show that the state court's legal analysis "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."

28 U.S.C. § 2254(d)(1).  Accordingly, the State is entitled to summary judgment on Reed's Eighth Amendment claim based on appellate delay.

### F. Lesser Included Offense

The trial court denied Reed's request to instruct the jury on the lesser included offense of murder.  It reasoned that the record would not permit a rational jury to find that Reed committed murder but not capital murder, and noted that Reed defended on the basis that he did not commit *any* offense, not on the basis that he "merely" committed murder.  Reed argues that failure to instruct on the lesser included offense violated his Eighth and Fourteenth Amendment rights, citing *Beck v. Alabama*, 447 U.S. 625 (1981).  *Beck* held that the death penalty could not be imposed "after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict."  447 U.S. at 627.  On Reed's direct appeal, the CCA found "there was no evidence at trial that tended to establish [Reed] was guilty only of murder, so that a rational trier of fact could have reached that conclusion."  *Reed v. State*, slip op. at 68.  The CCA's assessment of the factual record from trial appears to be a legal conclusion.  Reed has failed to show that that legal analysis "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Alternatively, in the event that assessment is considered to be a fact finding, Reed has failed to rebut by clear and convincing evidence the presumption that the CCA's fact findings were correct.  Accordingly, the State is entitled to summary judgment

on Reed's Eighth and Fourteenth Amendment claim based on failure to instruct regarding a

lesser included offense.

### CONCLUSION

Reed's petition for a writ of habeas corpus is denied.

SIGNED July 26, 2005.

David C. Godbey
United States District Judge